## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KAREN DANIELS, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Case No. 23-cv-10419-DJC |
| ALVARIA, INC., NOBLE SYSTEMS CORPORATION, and ASPECT SOFTWARE, INC., | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

### <u>MEMORANDUM AND ORDER</u>

CASPER, J.                                                                 February 23, 2024

## I.      Introduction

Plaintiff Karen Daniels ("Daniels") has sued Defendants Alvaria, Inc. ("Alvaria"), Noble Systems Corporation ("Noble") and Aspect Software, Inc ("Aspect") alleging violation of the Massachusetts Wage Act (the "Wage Act"), Mass. Gen. L. c. 149, §§ 148, 150, (Count I), retaliation under the Wage Act (Count II), sex discrimination, harassment and retaliation (Counts III and IV), breach of contract (Count V), breach of the implied covenant of good faith and fair dealing (Count VI), fraud (Count VII), estoppel (Count XIII), quantum meruit (Count IX) and unjust enrichment (Count X). D. 14-1. Defendants have moved to dismiss all claims, except the Wage Act retaliation claim (Count II). D. 16. For the reasons stated below, the Court ALLOWS the motion to dismiss in part and DENIES it in part.

## II.     Standard of Review

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Germanowski v. Harris, 854 F.3d 68, 71 (1st Cir. 2017). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while legal conclusions are not entitled credit. Id. Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (quoting Iqbal, 556 U.S. at 678). On a Rule 12(b)(6) motion, the Court may also consider documents incorporated into the complaint, as well as "documents the authenticity of which are not disputed by the parties," "official public records," "documents central to plaintiffs' claim" and "documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

## III.    Factual Background

Except where otherwise noted, the following facts are drawn from the amended complaint, D. 14-1, and accepted as true for the purpose of resolving the motion to dismiss.[1]

Daniels was a salesperson for Noble, a developer of call center technology, for more than twelve years. Id. ¶¶ 14, 15. Daniels sold Noble's software to customers who paid over a

---

[1] Having granted the motion to amend, D. 25, the amended complaint, D. 14-1, is the operative complaint.

contractually agreed-upon period after the software was deployed.  Id. ¶¶ 17–20.  As customers made their post-deployment payments, Noble would pay Daniels sales commissions from those payments.  Id. ¶ 22; D. 17-2 at 2. As alleged, Daniels did not need to take "further action for the commission to be earned."  D. 14-1 ¶ 22.

In March 2021, Daniels signed a compensation plan providing for specific commission rates (the "Legacy Noble Plan").  D. 17-1.  The Legacy Noble Plan incorporated by reference "company policy PO-ACCT-0001" (the "Noble Commissions Policy").[2]  Id. at 1; D. 17-2.  The Noble Commissions Policy describes the circumstances under which commissions are deemed earned and the impact of termination on an employee's receipt of commissions.  D. 17-2 at 2–4.

Some time in 2021, Noble merged with Aspect, forming Alvaria.  See D. 14-1 ¶¶ 26–30.  Alvaria thus assumed Noble's contracts and inherited Noble's workforce.  See id.  On May 18, 2021, Alvaria informed the former Noble sales team that as of June 30, 2021, Alvaria would not pay commissions on customer contracts it inherited from Noble, despite continuing to receive customer payments on those contracts.  Id. ¶¶ 34–36.  Later that month, Alvaria laid off 75% of the Noble sales team.  Id. ¶ 38.  The remaining sales team, including Daniels, did not receive commissions for Noble customer contracts, even those that remained under Alvaria.  Id. ¶ 40.

Believing that Alvaria's decision was "wrong," Daniels complained to various Alvaria executives regarding the payment of commissions.  Id. ¶¶ 42, 45.  She complained to Alvaria's Head of North American Sales, Rob Clarke ("Clarke").  Id. ¶ 45.  Clarke informed Daniels that "Alvaria was working on a solution to keep whole [sic] and pay for her commissions coming in

---

[2] The Legacy Noble Plan and Noble Commissions Policy are attached to Defendants' motion to dismiss, but as noted below, are properly considered by the Court, even on a 12(b)(6) motion to dismiss as central to Daniels's claims and repeatedly referred to in the complaint.  See Watterson, 987 F.2d at 3.

after June 30, 2021." Id. ¶ 48.  Clarke further stated that "Alvaria was working to pay her for a large sale [Daniels] made in 2020 for Comenity/Alliance Data." Id. ¶ 49.  Daniels then scheduled a meeting with "former-CEO Patrick Dennis . . . who directed her back to [the individual overseeing commissions]." Id. ¶ 50.

In June 2021, however, "Alvaria told Daniels it would not pay her any commissions on the disputed contracts due after June 30, 2021, including the Comenity/Alliance Data deal." Id. ¶ 51.  The next month, Alvaria distributed a new sales compensation plan which, unlike the Legacy Noble Plan, paid sales representatives when the sales contract was signed, instead of when customer payments arrived, and it would not pay commissions on contracts brought from Noble.  Id. ¶¶ 52–53.  Daniels continued to seek commissions for customer contracts she signed for Noble.  See id. ¶¶ 54–57.

On an October 8, 2021 quarterly business review meeting held by videoconference, Daniels presented her sales pipeline for fourth quarter 2021 and 2022.  Id. ¶¶ 58–59.  Dennis, to whom Daniels had previously attempted to complain about unpaid commissions, was "unusually harsh about her pipeline" and "specifically referenced her protected activities regarding payment of her commissions." Id. ¶ 60.  Daniels alleges that "Dennis stated that he [did not] care about [her] commissions and how staff is paid, he wants his '$1.2 million' for the fourth quarter 2022 and he wanted his 'fucking money.'" Id. ¶ 61 (alterations in original).  "He then said there was nothing more to talk about and they were done with the meeting." Id. ¶ 62.  Daniels reported this incident to Alvaria's human resources department ("HR").  Id. ¶ 65.  Alvaria hired an outside agency to investigate and determined that no retaliation occurred, id., but Daniels questions the thoroughness of this inquiry.  Id.  ¶¶ 66–67.

After Daniels retained counsel, Defendants agreed to pay some portion of the commissions she alleges were due, in the amount of $676,000. Id. ¶ 69. During negotiations with Daniels over her new compensation plan, Alvaria suggested keeping her on the Noble Legacy Plan through December 31, 2021. Id. ¶ 72. Although Daniels agreed to this "temporary solution," she expressed continued concern that under Alvaria's proposal "in 2022, she would not be paid for sales made in the fourth quarter of 2021," that her claim for "ongoing commissions" from former Noble customers after 2021 would remain unresolved, and that "Alvaria was intentionally stealing commissions from herself and others." Id. ¶ 73. Alvaria made four commission payments to Daniels in late 2021 and early 2022, but Daniels alleges that Defendants nevertheless failed to timely and fully pay Daniels's commissions, including for the Comenity/Alliance Data sale of October 2021. Id. ¶¶ 74–76.

On January 4, 2022, Alvaria informed Daniels that it would not provide her any information on its anticipated 2022 compensation plan until that plan was distributed. Id. ¶ 80. Daniels then met with an Alvaria HR employee to discuss her various concerns regarding Alvaria's failure to pay commissions. Id. ¶¶ 81–82. On February 9, 2022, Daniels was informed that her employment with Alvaria would be terminated as of February 14, 2022 and that Alvaria would not pay her the commissions requested. Id. ¶¶ 83–84.

## IV.    Procedural History

Daniels filed this action on December 7, 2022, in Middlesex Superior Court, D. 1-1 at 4. Defendants removed the case to this Court.[3]  D. 1.  Daniels moved to amend her complaint, D. 14,

---

[3] Although neither party has contested this Court's subject matter jurisdiction, the Court has an independent obligation to evaluate its jurisdiction over this matter. See Fed. R. Civ. P. 12(h)(3). The asserted bases for jurisdiction in the amended complaint, D. 14-1 ¶ 9, do not apply here because Daniels alleges state-law claims that neither arise "under the Constitution, laws or treaties of the United States" nor seek to redress "any right privilege or immunity secured by the Constitution of the United States or by any Act of Congress." 28 U.S.C. §§ 1331, 1343(3). The

and Defendants then moved to dismiss the amended complaint, D. 16.  The Court heard the parties

on the pending motions, granted the motion to amend and took the matter under advisement.  D.

25.

**V.     Discussion**

      **A.     <u>Consideration of Extrinsic Documents on a Rule 12(b)(6) Motion</u>**

      Although Daniels objects to Defendants' reliance upon the Legacy Noble Plan and the

Noble Commissions Policy in their opposition, she concedes that "a court may also consider

documents central to a plaintiff's claim or documents sufficiently referred to in a complaint

without converting a motion to dismiss into one for summary judgment."  D. 20 at 12; <u>see</u>

<u>Watterson</u>, 987 F.2d at 3.  The contract between Noble and Daniels governing the payment of

Daniels's commissions is central to her Wage Act and breach of contract claims and repeatedly

referred to throughout the complaint.  D. 14-1 ¶ 44 (alleging that "[t]here is no relevant legal

excuse for failing to pay commissions timely according to the commission plan"); <u>id.</u> ¶ 53

(explaining that new Alvaria sales plan "changed how Mrs. Daniels and other sales representatives

would be paid" as opposed to "Noble sales plan" that was previously in effect); <u>id.</u> ¶ 72 (alleging

that Alvaria offered to keep Daniels "on her prior Noble compensation plan"); <u>id.</u> ¶ 134 (alleging

that "Plaintiff and the Defendant were parties to a contract under which the Defendant agreed to

and had a duty to timely pay the Plaintiff commissions for her sales activities"); <u>see also</u> <u>id.</u> ¶¶ 64,

---

Court may nevertheless exercise diversity jurisdiction under 28 U.S.C. § 1332(a).   The
uncontroverted record in support of removal shows that (1) Daniels is a citizen of Massachusetts,
(2) Aspect "no longer exists as a separate legal entity" subsequent to its merger with Noble to form
Alvaria, (4) Alvaria and Noble are incorporated in Delaware and Georgia respectively, (5) Alvaria
and Noble have no principal place of business in Massachusetts and (6) the amount in controversy
exceeds $75,000.  D. 1 ¶¶ 12, 16–25, 29–35; D. 1-4 ¶¶ 3, 7–18; D. 14-2 ¶¶ 3-5; D. 14-2 at p. 21.
In their reply memorandum, Defendants submit that "Aspect no longer exists and should be
dismissed," D. 22 at 1 n.1, and, accordingly the Court dismisses Aspect.  For all of these reasons,
the Court concludes that it may properly exercise diversity jurisdiction.

108, 135.    Daniels does not dispute the authenticity of the Legacy Noble Plan and Noble Commissions Policy submitted by Defendants.  Under such circumstances, the Court may properly consider the Legacy Noble Plan and Noble Commissions Policy on when assessing Defendants' Rule 12(b)(6) motion.[4]

## B.    <u>Wage Act (Count I)</u>

The Wage Act requires the timely payment of employee wages.  Mass. Gen. L. c. 149, § 148; <u>see</u> <u>Crocker v. Townsend Oil Co.</u>, 464 Mass. 1, 13 (2012).  Commissions are subject to Wage Act requirements "when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee." Mass. Gen. L. c. 149, § 148.  "When a compensation plan specifically sets out the contingencies an employee must meet to earn a commission, courts apply the terms of the plan."  <u>McAleer v. Prudential Ins. Co.</u>, 928 F. Supp. 2d 280, 289 (D. Mass. 2013); <u>see</u> <u>Klauber v. VMware, Inc.</u>, 80 F.4th 1, 11 (1st Cir. 2023) (explaining that employee and employer may agree to modify the default rule that a commission becomes due and payable when the employee closes the sale).

For the purposes of the motion to dismiss, Defendants challenge Daniels's Wage Act claim only as to "post-termination commissions allegedly due under the Legacy Noble Plan into 2022 and beyond," and not as to commissions allegedly due while Daniels was still employed at Alvaria. <u>See</u> D. 16 at 1 n.2; D. 17 at 2 n.2.  The Court understands the post-termination commissions to refer to commissions associated with customer payments Defendants received and processed after Daniels's termination.  Even assuming in favor of Daniels that the new plan instituted by Alvaria did not supersede the Legacy Noble Plan, <u>cf.</u> D. 17 at 8 (arguing that claims for commissions to

---

[4] The Court had not considered or relied upon the correspondence between Daniels and Alvaria's general counsel, D. 17-3, which appears to be the focus of Daniels's objection to the consideration of documents not attached to the complaint.

be paid after "rollout of the new Alvaria plan" fail as a matter of law), the Court concludes that these commissions were neither definitely determined nor due and payable at the time of her termination.

A commission is "definitely determined" under the Wage Act when it becomes "arithmetically determinable." Ellicott v. Am. Cap. Energy, Inc., 906 F.3d 164, 169 (1st Cir. 2018) (quoting Wiedmann v. Bradford Grp., Inc., 444 Mass. 698, 708 (2005)).  Defendants assert that Daniels's commissions were not arithmetically determinable at the time of her termination, because the amount of the commissions owed to Daniels would vary based on how many customers in fact made their payments to Alvaria.  D. 17 at 9; D. 22 at 4.  The Court agrees with Defendants.  Where a commission depends upon customer payments not yet received at the time of an employee's termination, courts generally conclude that the commission is not definitely determinable and falls outside of the Wage Act's timeliness provisions.    Fine v. Guardian Life Ins. Co. of Am., 589 F. Supp. 3d 139, 154 (D. Mass. 2022) (concluding that commissions dependent on future renewal payments were not arithmetically determinable); Gallant v. Bos. Exec. Search Assocs., Inc., No. CIV.A. 13-12081-FDS, 2015 WL 3654339, at *8 (D. Mass. June 12, 2015) (concluding that recruiter's commissions were not arithmetically determinable where the size of fee depended on whether new hire met certain benchmarks after recruiter's termination).  Here, on the day of Daniels's termination (which is when the Wage Act would have required payment of her commissions), Alvaria could not have definitely or arithmetically determined the total commissions owed to Daniels for customer payments it had not yet received.

Similarly, commissions become due and payable when "any contingencies relating to their entitlement have occurred." McAleer, 928 F. Supp. 2d at 288 (citation omitted); see Klauber, 80 F.4th at 11 (concluding that commissions were not due and payable until after employer had

finished "reconciliation" process as provided for in commission plan). Here, the Noble Commissions Policy provided that "commissions are not earned and payable . . . unless the Company has collected all amounts due from Customer" and "such amounts are no longer subject to a refund." D. 17-2 at 2. This contractual contingency would not be satisfied for customer payments Alvaria received after terminating Daniels, and thus commissions tied to those payments would not be due and payable. See Fine, 589 F. Supp. 3d at 153–54 (holding that Wage Act claim failed because commissions contingent on client's continued payment of insurance renewal premiums were not due and payable when plaintiff was terminated); Gallant, 2015 WL 3654339, at *7 (holding that recruiter's commission was not due and payable as of her termination because commission were "subject to" employer's fee agreements with its clients and client fee was based retention period of new hire which had not expired); Smith v. Unidine Corp., No. SUCV2015-3417, 2017 WL 4411249, at *5 (Mass. Super. July 25, 2017) (holding that employee could not recover post-termination commissions where plan provided that "commissions are *earned ratably over a twelve-month period*" (emphasis in original)).[5]

Daniels cites Parker for the proposition that post-termination commissions that were not due and payable at the time of the employee's termination are still "wages" within the meaning of the Wage Act. D. 20 at 14 (citing Parker v. EnerNOC, Inc., 484 Mass. 128, 134–35 (2020)). Parker reiterated that "failure to pay commissions when they are definitely determined and due and

---

[5] A recent decision, published after the parties filed their briefs on the pending motion to dismiss, concluded that a plaintiff could recover post-termination commissions under the Wage Act despite a requirement that plaintiff be employed to earn commissions and the possibility that the employer could reverse a booking. Rivard v. NICE Sys., Inc., No. 1:23-CV-10576-AK, 2023 WL 5959305, at *4–6 (D. Mass. Sept. 13, 2023). It is unclear, however, how this analysis fares under First Circuit's recent ruling in Klauber, not addressed in Rivard, that "[c]ommissions are not necessarily due and payable simply because 'an employee has completed work on the deal,'" Klauber, 80 F.4th at 13, and which directs court to "enforce other valid contingencies to which the parties have agreed." Id. at 14.

payable is one way to violate the [Wage Act]." Parker, 484 Mass. at 135.  It did not hold, however, that employees have a right to timely payment of commissions that were not yet due and payable. Instead, Parker held that post-termination commissions may constitute "lost wages" for the purposes of calculating damages in a retaliation claim if an employee ultimately proves her employer terminated her to avoid paying those commissions.  Id. at 135–36 (explaining that "our cases interpreting the meaning of 'definitely determined' and 'due and payable' for the purposes of the timing of payment under the act did not contemplate whether unpaid commissions constitute 'lost wages' resulting from retaliation").  Daniels's Wage Act retaliation claim is pled as a separate count and is not challenged by Defendants in their motion to dismiss.  Parker thus does not impact the Court's analysis of Count I for untimely payment of post-termination commissions.

The Court concludes that Count I of the complaint fails as to any post-termination commissions Daniels would have earned.  Accordingly, the Court allows Defendants' motion to dismiss the Wage Act claim for timely payment of post-termination commissions (Count I).

## C.    **Breach of Contract (Count V)**

To succeed on a breach of contract claim under Massachusetts law, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." Bose Corp. v. Ejaz, 732 F.3d 17, 21 (1st Cir. 2013).  "Interpretation of an unambiguous contract is a matter of law and may, therefore, be done at the motion to dismiss stage." Ruiz v. Bally Total Fitness Holding Corp., 447 F. Supp. 2d 23, 28 (D. Mass. 2006), aff'd, 496 F.3d 1 (1st Cir. 2007).  The Court must interpret contracts "as a whole," with attention to "the context of its creation." Id.

Here, Daniels alleges that "Defendant breached its contractual duty by failing to pay Plaintiff the commissions due pursuant to the terms of the contract." D. 14-1 Id. ¶ 135.  Daniels's

briefing offers little insight into what contract was breached and which commissions were not paid, but the Court understands the relevant contract to be the Legacy Noble Plan between Daniels and Alvaria and that Daniels seeks commissions due to her beginning in July 2021 through January 2022.  See id. ¶¶ 48, 51–52, 72, 74 (alleging that parties agreed to keep Daniels on Legacy Noble Plain and that Daniels was not timely paid for "commissions due in the months of July, September, October, November, December of 2021, and January 2022").  As previously noted, Defendants do not seek dismissal of Daniels's claim commissions that were due prior to her termination in February 2022.[6]  See D. 16 at 1 n.2.   To the extent Daniels seeks to recover for any failure to pay her post-termination commissions as a breach of the Legacy Noble Plan, however, Defendants assert that such a claim is barred by the unambiguous language of Daniels's agreement.  D. 17 at 11–12; D. 22 at 5–6.

The Legacy Noble Plan expressly provides that Daniels's commissions are "subject to" the Noble Commissions Policy.  D. 17-1 at 1.  The Noble Commissions Policy deems Daniels's commissions "earned and payable" once Noble has collected the customer payment in full and such payment is not subject to a refund.  D. 17-2 at 2.  In the event of a termination, the Noble Commissions Policy provides that Noble will pay commissions on any addendum fully paid by the customer and fully processed by Noble prior to the termination date.  Id. at 4.  Noble will not pay commissions tied to addendums that have not been fully processed and paid prior to the termination date.  Id.   Under the plain language of the agreement, Defendants would not have breached their obligations under the Legacy Noble Plan by refusing to pay commissions on payments they received after Daniels's termination.  See Smith, 2017 WL 4411249, at *6

---

[6] Even as alleged, id. ¶¶ 69, 74–76, Defendants have made four payments totaling over $676,000 in commissions owed sometime after October 2021, but it is not clear from the limited record at this stage what portion of the total amount allegedly due these payments represent.

(explaining that court's conclusion that commissions were not earned or due and payable under terms of parties contract for Wage Act claim "necessarily resolves plaintiffs' claims for breach of contract").

In opposing the motion to dismiss her claim for post-termination commissions, Daniels suggests that she may nevertheless be owed commissions based on Defendants' "ongoing customer contracts" rather than the Legacy Noble Plan.  D. 20 at 16–17 (asserting that Daniels and customers performed under the contracts but Alvaria did not).  These "customer contracts" are only cursorily mentioned in connection with the complaint's breach of contract allegations.  D. 14-1 ¶ 134.  Daniels pled that Defendants' customers were legally obligated to pay Defendants under these contracts, but does not plausibly allege that she was a party to the customer contracts or that Defendants promised to pay their sales representatives in those contracts.  Daniels has not explained how she would have standing as a non-party to enforce the contracts between Defendants and their customers or adequately pled a factual basis for such an argument.  See HP, Inc. v. TÜV Rheinland of N. Am., Inc., No. 21-cv-11575-AK, 2022 WL 4486049, at *3–4 (D. Mass. Sept. 27, 2022) (granting motion to dismiss third-party beneficiary claim for breach of contract where the complaint did not plausibly suggest that buyer was intended beneficiary of contract between seller and testing lab); Honey Farms, Inc. v. Exxon Mobil Corp., No. 081601D, 2009 WL 3085798, at *2 (Mass. Super. Sept. 11, 2009) (granting motion to dismiss breach of contract and implied covenant of good faith and fair dealing claims where plaintiff failed to plausibly allege that it was intended beneficiary of sales contract between defendant and its distributor).[7]

---

[7] The Court notes that HP, Inc. applied Connecticut law regarding third-party beneficiaries' contractual rights, while this case is governed by Massachusetts law.  HP, Inc., 2022 WL 4486049, at *3.  The HP decision is nonetheless persuasive as both jurisdictions rely on the approach set forth in the Restatement (Second) of Contracts.  See id.; S. Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc., 183 F. Supp. 3d 197, 234 (D. Mass. 2016) (collecting cases).

Accordingly, the Court grants the motion to dismiss as to any breach of contract claim for commissions tied to payments Defendants received and processed after Daniels's termination. The breach of contract claim survives as to commissions due under the Legacy Noble Plan from July 2021 through January 2022, while Daniels remained employed by Alvaria.

### D.      Breach of the Implied Covenant of Good Faith and Fair Dealing (Count VI)

Although Massachusetts generally recognizes that at-will employment can be terminated by either party without reason, the "covenant of good faith and fair dealing is 'implicit in all Massachusetts contracts, including contracts for employment at will.'" Artuso v. Vertex Pharms., Inc., 637 F.3d 1, 8 (1st Cir. 2011) (quoting Harrison v. NetCentric Corp., 433 Mass. 465, 473 (2001)). In Gram I, the SJC recognized that an employee may recover commissions she "reasonably could have expected to receive" if she was terminated in violation of the implied covenant of good faith or fair dealing. Gram v. Liberty Mut. Ins. Co. ("Gram I"), 384 Mass. 659, 673 (1981); see Fortune v. Nat'l Cash Reg. Co., 373 Mass. 96, 105 (1977) (holding that jury verdict on breach of implied covenant was supported where employer terminated salesman one day after receiving a $5,000,000 order). The commission must be "clearly related to an employee's past service," rather than payment for work that had not yet been performed. Gram I, 384 Mass. at 672.

Defendants argue that this claim should be dismissed because Daniels had not "earned the commissions she now seeks." D. 17 at 13. Courts have declined extend Gram I to situations where the future compensation or commission sought is contingent on challenging milestones or tied to services which would have been rendered post termination. See, e.g., Harrison, 433 Mass. at 473 (affirming summary judgment against implied covenant claim where employee sought shares of employer's stock that was unvested as of his termination, because "the unvested shares are not earned compensation for past services, but compensation contingent on his continued employment"); Gram v. Liberty Mut. Ins. Co. ("Gram II"), 391 Mass. 333, 334–37 (1984)

(explaining that although future renewal commissions tied to insurance salesman's past services were recoverable, salesman was not entitled to "speculative" commissions on anticipated policy changes that might affect policy costs).  Even where a plaintiff's claim for future commissions under the Wage Act or a simple breach of contract theory fails, her claim under the implied covenant may survive if she "had already done a significant amount of work, with a reasonable expectation that the work would continue . . . to the completion of that project."  Krause v. UPS Supply Chain Sols., Inc., No. 08-cv-10237-DPW, 2009 WL 3578601, at *14 (D. Mass. Oct. 28, 2009) (quoting Cataldo v. Zuckerman, 20 Mass. App. Ct. 731, 741 (1985)) (alteration in original) (denying summary judgment on implied covenant claim where plaintiff was "on 'the brink of' earning commissions  on three accounts before her termination" but granting summary judgment as to Wage Act violation); see Fine, 589 F. Supp. 3d at 157, 162 (granting summary judgment as to Wage Act claims but allowing theory under Gram I to proceed to jury).

Although Daniels's post-termination commissions are dependent on some contingencies, taking factual allegations as true and drawing all plausible inferences Daniels's favor, the complaint nevertheless states a claim under Gram I.  Indeed the court in Gram I specifically acknowledged that the future commissions sought might be contingent on customer's decision to continue paying plaintiff's employer.  Gram I, 384 Mass. at 672 (allowing recovery of future renewal commissions even where "each renewal commission depended on the policyholder deciding to continue his coverage with [defendant]").  As alleged, once Daniels secured a sales contract with a customer, "[t]here was no further action for the commission to be earned."  D. 14-1 ¶ 22.  Under such circumstances, the Court concludes that Daniels has adequately pled that the post-termination commissions were compensation sufficiently related to her pre-termination sales and thus recoverable if she can prove that Defendants terminated her employment in violation of

their duty to exercise their discretion in good faith.  See Gram I, 391 Mass. at 671–72; compare
Cataldo, 20 Mass. App. Ct. at 741 (affirming judgment for employee as to future vested equity in
development projects on which he had significant responsibilities and performed significant work
and where project had "gone beyond a mere hope or prophecy"), with Suzuki v. Abiomed, Inc.,
943 F.3d 555, 567 (1st Cir. 2019) (holding that pharmaceutical company need not pay vice
president bonus tied to regulatory approval where such approval "was only achieved after fifteen
months of substantial additional work").

Defendants further object that Daniels has not sufficiently pled that "Alvaria terminated
[her] to avoid paying [her] these future, speculative commissions" and emphasize that Alvaria
gave Daniels special consideration by allowing her to remain on the Legacy Noble Plan through
the end of 2021.  D. 17 at 13.  Lack of good faith, however, must be determined from the totality
of the circumstances.  See T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 570 (2010).
Daniels alleges that at least one superior at Alvaria expressed hostility towards her requests for
commissions.  D. 14-1 ¶¶ 59–62.  Further, Daniels alleges that she was fired shortly after reporting
her concerns regarding the Alvaria commissions plan to human resources.  Id. ¶¶ 80–83; see Gram
I, 384 Mass. at 668 (recognizing that bad faith may be established where "employer's retaliatory
discharge was its reaction to appropriate, socially desirable conduct of the employee").  Due to the
discharge, Daniels could not receive commissions she might otherwise have become entitled to
under the Noble Commissions Policy.  See D. 17-2 at 4.  At the pleadings stage, such allegations
permit the inference that Defendants retaliated against Daniels for seeking to enforce her rights
under the Wage Act or to avoid paying the commissions that Daniels was demanding and thus
terminated her in bad faith.

Accordingly, the Court denies the motion to dismiss the breach of the implied covenant of good faith and fair dealing claim, Count VI.

###    E.    Fraud, Misrepresentation or Deceit (Count VII)

To state a claim of fraud under Massachusetts law, the plaintiff must allege "[1] a false representation [2] of a matter of material fact [3] with knowledge of its falsity [4] for the purpose of inducing [action] thereon, and [5] that the plaintiff relied upon the representation as true and acted upon it to his [or her] damage."  Balles v. Babcock Power Inc., 476 Mass. 565, 573 (2017) (alterations in original) (internal quotation marks and citation omitted). When alleging fraud, a pleading party "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  In other words, the pleading must "specify the statements that the plaintiff contends were fraudulent," explain why they were fraudulent, Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997) (citation omitted), and otherwise identify "'the who, what, where, and when of the allegedly [misleading] representation' with particularity," Ezell v. Lexington Ins. Co., 926 F.3d 48, 51 (1st Cir. 2019) (quoting Kaufman v. CVS Caremark Corp., 836 F.3d 88, 91 (1st Cir. 2016)).

As to the first element, Daniels's fraud claim is based on Defendants' "representations to pay [her] commissions due, which she relied on to her detriment."  D. 20 at 18.  To the extent that Daniels argues that the merger between Noble and Alvaria itself constituted "promises to honor the contract and debts of Noble" and to "pay Mrs. Daniels a specific commission on each sale," id. at 16–18, the complaint alleges no specific statements Defendants made to her during the merger as to the permanency of the Legacy Noble Plan.  Thus, the Court concludes that Daniels has not adequately pled a fraud claim as to any promises by Alvaria to honor Noble's commitments.

The only specific promise to pay Daniels the Court can identify from the complaint consists of statements made by Clarke that "Alvaria was working on a solution to keep whole [sic] and pay

for her commissions coming in after June 30, 2021" and that "Alvaria was working to pay her for a large sale she made in 2020 for Comenity/Alliance Data." Id. ¶¶ 48–49. As an initial matter, Alvaria argues that Clarke's alleged misrepresentations are "promissory in nature" and thus not actionable. D. 17 at 14. "[S]tatements of present intention as to future conduct may be the basis for a fraud action . . . if the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage." Gravelle v. Hudson Lock LLC, No. 16-cv-12548-LTS, 2018 WL 627373, at *5 (D. Mass. Jan. 30, 2018) (quoting Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 226 (1st Cir. 2003)). Drawing all reasonable inferences in Daniels's favor, Daniels has at least plausibly alleged that when Clarke told her that Alvaria was "working" to pay her commissions, Defendants had no intent to ever pay her commissions. See Bhammer v. Loomis, Sayles & Co., Inc., No. 15-cv-14213-FDS, 2016 WL 3892371, at *4 (D. Mass. July 14, 2016) (inferring that statements of present intent were actionably false where they were contradicted by defendant's actions "shortly thereafter").

Still, Daniels must plead her fraud claim with particularity to survive a motion to dismiss. Although the who and what of Clarke's statements have been pled with particularity, when and where are less clear. As to the timing the Court can at least plausibly infer that the conversation occurred after Alvaria announced its intent to change the commissions plan on May 18, 2021, id. ¶ 34, but before the end of June 2021 when Alvaria reversed course, id. ¶ 51. It may also be possible, taking a generous view of Rule 9(b), to infer that the conversation took place while Daniels was at work.

Even assuming Daniels has pled sufficiently that Defendants knowingly made a material misrepresentation, the fraud claim fails because she does not allege plausibly that she relied upon Clarke's statements and acted upon them to her detriment. See Woods v. Wells Fargo Bank, N.A.,

733 F.3d 349, 358 (1st Cir. 2013) (holding that complaint failed to allege fraud where it was "wholly silent on the issue of [plaintiff's] actual reliance"); Juárez v. Select Portfolio Servicing, Inc., 708 F.3d 269, 280 (1st Cir. 2013) (holding that reliance was not adequately pled where it was only "possible" that plaintiff relied upon representations and otherwise would have acted to prevent foreclosure).  Alvaria corrected Clarke's alleged misrepresentation by June 2021, when it informed Daniels that she would not be paid. D. 14-1 ¶ 51.  The complaint does not suggest that Daniels forwent any opportunity or changed her position between May and June of 2021 in detrimental reliance on the alleged misrepresentation.  Nor is it plausible to infer that Daniels chose to remain employed in reliance on Clarke's statements, where Daniels stayed at Alvaria until February 2022, during which time she was aware that Alvaria did not intend to pay her the disputed commissions and she was advocating for payment of same.  Id. ¶¶ 54–57, 77–84.  The complaint also fails to identify any injury or harm Daniels suffered as a result of Clarke's alleged short-lived promise that she would receive her commissions.  See Saade v. Pennymac Loan Servs., LLC, No. CV 15-12275-IT, 2016 WL 4582083, at *7 (D. Mass. Aug. 31, 2016), report and recommendation adopted, 2016 WL 6089684 (D. Mass. Oct. 17, 2016), aff'd, No. 16-2396, 2018 WL 11433614 (1st Cir. Apr. 11, 2018) (dismissing fraud claim where plaintiff failed to allege "that he relied on any alleged misrepresentation" or "that he suffered any pecuniary loss as a result of any alleged misrepresentation").

Accordingly, the Court grants the motion dismiss the fraud, misrepresentation and deceit claim, Count VII.

### F.    Promissory Estoppel, Quantum Meruit, Unjust Enrichment (Counts VIII, IX, X)

As an initial matter, Defendants argue that Daniels's claims for promissory estoppel, quantum meruit and unjust enrichment should be dismissed as incompatible with her claims under

the Wage Act, breach of contract and breach of the implied covenant of good faith and fair dealing. Fed. R. Civ. P. 8(d), however, "permits [p]laintiffs to plead alternative and even inconsistent legal theories . . . even if [p]laintiffs can only recover under one of these theories." Lass v. Bank of Am., N.A., 695 F.3d 129, 140 (1st Cir. 2012) (quoting Vieira v. First Am. Title Ins. Co., 668 F. Supp. 2d 282, 294–95 (D. Mass. 2009)) (allowing plaintiff to plead breach of contract and unjust enrichment); see KSA Elecs., Inc. v. M/A-COM Tech. Sols., Inc., No. CV 15-10848-FDS, 2015 WL 4396477, at *4 (D. Mass. July 17, 2015) (allowing plaintiff to plead quantum meruit and promissory estoppel in the alternative).

As to the promissory estoppel claim in particular, Defendants additionally argue that Daniels has failed to "allege with specificity which promises or representations were made to her that render her eligible for recovery on this theory, how she relied on such promises, or how she suffered as a result of reliance." D. 17 at 16. Under a plausibility pleading standard, the amended complaint does not permit the inference that Daniels relied upon Alvaria's promises to pay her to her detriment. Although the complaint alleges that "[i]n reliance on Defendants' promises, Plaintiff worked continuously, diligently and effectively on behalf of clients," D. 14-1 ¶ 154, Daniels remained employed at Alvaria despite repeated statements from Alvaria employees that she would not be paid her commissions under the Legacy Noble Plan, id. ¶¶ 51–57, 77-78. Gould v. Bank of New York Mellon, 123 F. Supp. 3d 197, 204 (D. Mass. 2015) (dismissing promissory estoppel claim for lack of detrimental reliance where plaintiff continued to reside at property before and after alleged promises and complaint contained "no facts suggesting that [p]laintiffs suffered any detriment as a result of that reliance"). As noted above, Alvaria stated in June 2021 that it would not pay Daniels commissions she would have earned under the Legacy Noble Plan, yet Daniels stayed at Alvaria until she was terminated in February 2022.

Accordingly, the Court allows the motion to dismiss as to the promissory estoppel claim, Count VIII, but denies the motion to dismiss the quantum meruit and unjust enrichment claims, Counts IX and X.

### G.     Sex Discrimination and Harassment (Count III)

To prevail on a claim of sex-based employment discrimination under Chapter 151B, a plaintiff must prove four elements:  (1) membership in a protected class, (2) harm, (3) discriminatory animus, and (4) causation.  Sullivan v. Liberty Mut. Co., 444 Mass. 34, 39 (2005). A plaintiff need not plead facts sufficient to establish "a prima facie case . . . in order to survive a motion to dismiss," Swierkiewicz v. Sorema N. A., 534 U.S. 506, 511 (2002), but "must plead enough facts to make entitlement to relief plausible," Higgins v. State St. Corp., 323 F. Supp. 3d 203, 206 (D. Mass. 2018).  "Put simply, the complaint has to allege a plausible basis for a claim of *discrimination*, not just unfair treatment." Alicea v. N. Am. Cent. Sch. Bus, LLC, 232 F. Supp. 3d 213, 215 (D. Mass. 2017) (emphasis in original).

Here, the complaint contains only conclusory allegations of disparate treatment and discriminatory animus, D. 14-1 ¶ 31 (alleging "Alvaria treated [Daniels] and other females worse than their male peers due to discriminatory animus on the basis of gender"); id. ¶ 32 (alleging "Alvaria's management structure and staff breakdown shows a landscape of failing to promote, hire and retain female employees").  Plaintiff provides no factual basis for these allegations.  See Mekonnen v. ABM Parking Servs., Inc., 14-cv-12389-IT, 2014 WL 5112110, at *4 (D. Mass. Oct. 10, 2014) (dismissing plaintiff's sex-based discrimination claim where plaintiff made only conclusory allegations that "her employer treated male employees more favorably by not taking action against them when they violated the company's rules and that her replacement was male").  Daniels contends that she has a right to discovery to unearth the relevant facts, D. 20 at 15, but "[t]he mere fact that a female . . . employee was terminated does not trigger a right to conduct

discovery, in hopes that evidence of a discriminatory motive may turn up." Alicea, 232 F. Supp. 3d at 215-16 (dismissing claim where complaint focused on son's conduct and defendant's misrepresentations and was "devoid of *any* facts connecting plaintiff's termination to her race, gender or age") (emphasis in original).  Without more, Daniels does not state a plausible claim for discrimination based on sex.  See, e.g., Salomon v. Mass. Hous. Fin. Agency, No. 22-cv-10181-ADB, 2023 WL 2588334, at *11 (D. Mass. Mar. 21, 2023) (dismissing age discrimination claim where plaintiff alleged that supervisor "hired predominantly younger people" and "was more lenient with these younger employees" but did not plausibly "connect that concern to his negative performance review"); Bottomley v. Boston Pub. Schs., No. 17-cv-12107-LTS, 2018 WL 6682764, at *3 (D. Mass. Dec. 19, 2018) (dismissing c. 151B claim for lack of causation where complaint permitted inference that employer acted with "particular animus" against plaintiff but not with "discriminatory animus based on race, sex, or age").

Daniels's sexual harassment claim fails for a similar reason.  To prevail on a claim for sexual harassment and hostile work environment, the Daniels must establish, among other elements, that she was "subjected to unwelcome sexual . . . harassment" and that the "that the harassment was based upon sex." Posada v. ACP Facility Servs., Inc., 389 F. Supp. 3d 149, 157 (D. Mass. 2019) (citation omitted); Mass. Gen. L. c. 151B, § 1(18).  Here, the complaint fails to allege any conduct, statements, requests, advances or gestures of a sexual nature towards Daniels by any other Alvaria employee.  The complaint merely states in a conclusory manner that Defendants "harassed" Daniels.  D. 14-1 ¶¶ 1, 90, 122.

Accordingly, the Court grants the motion to dismiss as to Daniels's claim for sex discrimination and harassment, Count III.

### H.    Retaliation under Mass. Gen. L. c. 151B § 4(4) (Count IV)

To plead a c. 151B retaliation claim, Daniels must allege that she "engaged in protected conduct, that [s]he suffered some adverse action, and that a causal connection existed between the protected conduct and the adverse action." Psy-Ed Corp. v. Klein, 459 Mass. 697, 707 (2011) (internal quotation marks and citation omitted); see Ponte v. Steelcase Inc., 74 F.3d 310, 321 (1st Cir. 2014). For purposes of c. 151B, § 4(4), "protected conduct" refers to actions taken by the plaintiff "to protest or oppose statutorily prohibited discrimination." Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 383 (2016) (quoting Mass. Gen. L. c. 151B, § 4). Causation requires the plaintiff to "show that the defendant had knowledge of the protected conduct." Navarro v. U.S. Tsubaki, Inc., 577 F. Supp. 2d 487, 500–01 (D. Mass. 2008).

Here, the complaint does not permit the plausible inference that Daniels ever reported, opposed or protested sex discrimination while employed by Defendants. Daniels alleges various instances in which she met or communicated with coworkers and supervisors. D. 14-1 ¶¶ 45, 50, 54, 81–82. As alleged, these communications focused on her "attempts to resolve her commissions concerns." Id. ¶¶ 55, 82. While the complaint amply describes Daniels's complaints regarding untimely payment of her commissions, it nowhere states that Daniels ever complained of discrimination or harassment on the basis of sex, gender or other status protected by c. 151B. Given that the complaint does not allege that Daniels engaged in protected conduct taken to protest or oppose prohibited discrimination, it necessarily follows that her termination cannot be plausibly linked to protected conduct. See Navarro, 577 F. Supp. 2d at 501.

Accordingly, the Court allows the motion to dismiss as to Daniels's c. 151B retaliation claim, Count IV.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss in part, D. 16, as to Count I (untimely payment of commissions under the Wage Act) and V (breach of contract) as to commissions that allegedly were due after Daniels's termination on February 14, 2022.  The Court further ALLOWS the motion to dismiss as to Counts III (sex discrimination and harassment), IV (c. 151B retaliation), VII (fraud, misrepresentation and deceit) and VIII (promissory estoppel) but otherwise DENIES the motion to dismiss.  As a result, Counts I (untimely payment of commissions under the Wage Act) and V (breach of contract) survive the motion to dismiss as to commissions that were due from July 2021 through January 2022 and Counts II (retaliation under the Wage Act), VI (breach of the implied covenant of good faith and fair dealing), IX (quantum meruit) and X (unjust enrichment) will proceed in their entirety.

**So Ordered.**

/s Denise J. Casper
United States District Judge

23